PEOPLE v. KERR.

(*Court of Oyer and Terminer, New York County.* March, 1889.)

1. CRIMINAL LAW—ACCOMPLICES—WITNESS.
While the jury may reject the testimony of an accomplice who admits that he has previously perjured himself about the same transaction, they are not bound to do so, but may give it such credit as, in view of all the circumstances, including any corroborating testimony that may have been introduced, they may deem it entitled to.

2. SAME—CREDIBILITY.
A witness is not necessarily to be wholly discredited because he swears falsely to some one or more material statement, but the jury are to consider his evidence, and determine what weight it should receive.

3. SAME—EVIDENCE—CONSPIRACY—DECLARATIONS.
After a combination or conspiracy between a defendant and others to commit a crime is shown, the admissions and acts of the others in furtherance of the common design are competent evidence against defendant.

4. SAME—CHARACTER.
Good character of a defendant is of itself a sufficient fact from which a reasonable doubt of guilt may arise.[1]

5. SAME—QUANTUM OF EVIDENCE.
While all the essential facts constituting a crime must be established beyond a reasonable doubt, each fact relied on as a circumstance tending to prove guilt need not be so proved.[2]

6. SAME—BRIBERY.
Personal participation in a scheme to bribe public officers is not essential to constitute guilt, but the accomplishment of the act by means of another or others is sufficient.

[1] Evidence of previous good character of a defendant is positive evidence, which may of itself produce such reasonable doubt as may result in an acquittal. Becker v. Com., (Pa.) 9 Atl. Rep. 510. In general, as to the weight to be accorded to the good character of a defendant in determining his guilt, see State v. Sauer, (Minn.) 38 N. W. Rep. 355, and note.

[2] As to when the rule requiring the guilt of a defendant in a criminal case to be established beyond a reasonable doubt is satisfied, see Zwicker v. State, (Tex.) 11 S. W. Rep. 633; State v. Sauer, (Minn.) 38 N. W. Rep. 355, and note.

**7. SAME—EVIDENCE.**

Evidence that the corporation in whose interest the bribery seems to have been committed, and of which defendant was an officer, at about the time the desired act was done by the public officers, raised the amount of money which, according to the testimony of one of the bribed officials, was required to effect the bribery of a sufficient number of officers to accomplish the purpose of the corporation, that there was no apparent necessity for the money for legitimate purposes, and that the money did not appear to have been used for legitimate ends, tends, not only to connect defendant with the bribery, but also to corroborate the accomplice's testimony.

**8. SAME.**

The bribery being with the object of securing a street-railway franchise from the board of aldermen, evidence that those members who, by the testimony of the accomplice, were implicated in the conspiracy, voted against a resolution to sell the franchise at auction, is competent, in corroboration of the testimony of the accomplice.

Indictment against Thomas B. Kerr for the bribery of one Fullgraff, an alderman of New York city. For other cases involving the same bribery, see *People* v. *Sharp*, 14 N. E. Rep. 319; *People* v. *McQuade*, 18 N. E. Rep. 156.

*John R. Fellows*, Dist. Atty., and *James Fitzgerald* and *McKenzie Semple*, Asst. Dist. Attys., for the People. *Noah Davis, Robert G. Ingersoll*, and *John H. Bird*, for defendant.

DANIELS, J., (*charging jury*.) The time has arrived, after long and patient attention to the evidence, and the arguments which have been made by the counsel on either side, in the presentation of this case, for you to enter upon your deliberation, in order to determine whether this indictment which has been presented against the defendant is well founded upon the evidence, as it is claimed to be on the part of the prosecution, or whether the evidence leaves the case in such a shape that there may, notwithstanding all the facts and circumstances which have been proved, remain still in your minds that reasonable doubt which the defendant in all criminal cases is entitled to where it exists, and which may lead to his acquittal. It is for you, gentlemen, to approach the consideration of the case impartially, without feeling, without fear, or without hope of reward or approbation, and to examine the evidence carefully, as it has been laid before you during the progress of the case, in order to determine, under the dictates and influences of your own judgments alone, whether the case has been made out as it is now presented to you by this indictment. The indictment seems to have been found some time since, and, as it has been presented by the grand jury, it charges this defendant with the crime of bribery under the statutes of this state. The statutes upon this subject have undergone changes at different intervals, until they have reached their present comprehensive condition. There seems to have been a feeling actuating legislative action that this was, to a certain extent, at least, a growing evil in the community, in the state; and that it is necessary, for the purpose of checking and properly restraining it, to impose the restraints of punishment, under legislation concerning whose intent and comprehension there could be no substantial doubt. In pursuance of this conviction the laws have been changed. They have been amended and enlarged from time to time, until they are now contained in the Penal Code of the state, and relate to all the officers that may be engaged in its service. They begin with the executive, following with legislative and judicial officers of state, and finally, by a general clause relating to all other officers, including the offense charged in this indictment. A growing solicitude has been manifested by the legislature in this respect to frame and maintain the legislation of the state in such a form and in such a manner as will meet the emergency of the times, and check and restrain the existence of this evil, which must be regarded as appalling. If bribery is to affect the official conduct of individuals occupying positions of authority, you will see at once, upon your own reflection, that, as far as it extends, the fair administration of the laws will be subverted—they must be

subverted—in consequence of the exercise of influences of this character, and when the offenses are brought to the attention of courts and juries, and are to be disregarded, or are to be allowed to pass without punishment, then direct encouragement will be afforded to the increase and spread of this offense until its pernicious influence may endanger the very existence of the institutions of the state. It is not, of course, gentlemen, intended by this suggestion that you shall take it for granted that an offense has been made out by the evidence in this case, but it is to enjoin upon your minds that degree of care, caution, and solicitude which is necessary for the purpose of examining, and coming to a rational and true conclusion, concerning the charge made in this indictment. The case is to be made out by proof, the same as all other cases. It is not necessary that it should be by direct and positive evidence of witnesses, but it is sufficient in the judgment of the law that the species of evidence may combine with circumstances of such force and weight, when they are united and considered together, as to leave no rational doubt whatever in the mind as to the truth of the charge contained in the indictment. The administration of the criminal law is essentially dependent, in a large degree necessarily, on the existence and force of circumstances, for the purpose of making out criminal charges. This results from the fact that crimes ordinarily seek concealment. They are not committed ordinarily, openly, and before the public, or before the public eye, but occasions are sought for the commission of crime when safety or security from observation, or from prosecution and punishment, to a certain degree, may be within the hope and the expectation of the culprit. For this reason it has been found at all times in the intelligent administration of the law necessary to resort in a great measure to the force and effect of circumstances in order to discover from the inferences that may be drawn from the circumstances whether the offense has or has not been committed. The law upon this subject has been wisely and carefully settled for the purpose of guarding the rights and interests of the defendant as well as protecting those of the public, who are prosecutors in the case; and it requires, where the case depends, as this certainly does,—at least one branch of it depends,—on circumstantial evidence, that those circumstances shall be of such a persuasive or satisfactory character as to leave no rational ground of doubt as to the defendant's guilt before he may be convicted. In other words, the circumstances are required to be of so forcible a nature as to exclude every other reasonable supposition or hypothesis or theory than that of the defendant's guilt, before a conviction can be reached by force of evidence of this description. The circumstances, however, gentlemen, are not to be regarded or treated with suspicion, for, in the ordinary affairs of life, men are accustomed to appeal to circumstances for the purpose of determining the truth of conflicting statements, or conflicting rumors or reports; and, where there is a conflict between witnesses in the courts of justice, nothing is more common than to determine the controversy by appealing to some significant circumstances that may be developed by the proof, indicating where the truth lies between the persons who may swear directly opposite in the course of their examination.

Now, this indictment depends upon two substantial or material facts being established by the evidence. The first is that Fullgraff, the person named in the indictment, was bribed and influenced in the vote that he gave upon August 30, 1884. That is the first charge which is contained in the indictment, and it alleges such to have been the case. Then the second part of the indictment charges that the defendant, together with James A. Richmond, James W. Foshay, John Keenan, Robert E. De Lacey, and William H. Moloney, combined for the purpose of carrying this bribery into effect and execution. That is substantially the case as it is presented by the indictment, and you will see this at once logically, as well as naturally, divides itself into two branches. The first inquiry is whether the board of aldermen or this man Fullgraff was

in point of fact bribed and induced to cast his vote in favor of this measure that engaged the attention of the board of aldermen upon this occasion, by the hope or expectation of this reward. The proceeding before the common council was set on foot in pursuance of a statute of the state which was enacted on May 6, 1884. This statute provided generally for the construction of street surface railways in the various cities and villages of this state, and provided for the manner in which the proceeding should be carried on in order to secure the right on the part of a railway corporation to construct and operate such a road. It was passed in pursuance of a provision of the constitution of the state which was finally adopted at the election in the year 1874, and went into effect upon January 1, 1875. By this constitutional amendment, affecting the power of the legislature to pass local or private acts, it was provided in these words: "That the legislature shall pass general laws providing for the cases enumerated in this section, and for all other laws which in its judgment may be provided for by general laws, but no law shall authorize the construction or operation of a street railroad, except upon the condition that the consent of the owners of one-half in value of the property bounded upon, and the consent also of the local authorities having the control of that portion of, the street or highway upon which it is proposed to construct or operate such railroad, be first obtained. In case the consent of such property owners cannot be obtained, the general term of the supreme court in the district in which it is proposed to construct may, upon application, appoint three commissioners, who shall determine as to who are the parties interested, and whether such railroad ought to be constructed or operated." You will see from the reading of this provision of the constitution that two things were contemplated—two were equally requisite—for the purpose of entitling a railway corporation to the right to construct and maintain a railroad on Broadway, under the act of 1884. The act of 1884 was, I believe, the first general law that was passed in pursuance of this provision of the constitution for the purpose of carrying its intent and effect into operation, and it was under this law of 1884 that this Broadway Surface Railway Company was incorporated. On the 12th of May, 1884, six days after the passage of the act, and in order to entitle the company to the right of constructing and operating the road, two modes of proceeding, entirely disconnected with each other, were provided for by the law. The first was that they should obtain the consent of one-half the property owners whose property was bounded upon the street over which the proposed railway was to be constructed or operated; and, in case of a failure to obtain that consent, then three commissioners might be appointed to take evidence, and inquire into the propriety of the construction and maintenance of such a road; and if they concluded, after hearing the parties and hearing the evidence, that that was a proper and feasible thing to do, should report in favor of it, and that report should be confirmed by the court, and then that part of the proceedings would be carried into successful operation; and that was the case. That proceeding was complied with. That portion of the statute was followed in this instance, so that in the year 1885, over a year after the organization of this company, that part of this proceeding was completed and laid out of the way, but that did not in and of itself authorize the company to maintain and construct this road. Another step was equally essential, perhaps more vitally important for the reason that the question that was committed to the commissioners and the court was simply whether a road should be constructed on Broadway or not, while that which was confided to the board of aldermen as the local authorities that had the right to give the consent in case it was deemed advisable to give it through the board, which was invested with a wise discretion was to enable the board to determine upon what terms or conditions, or for what remuneration or return, this privilege or franchise might be conferred upon a railway corporation. In this respect it had large and unqualified discretion. The law confided the en-

tire subject to the exercise of the judgment and discretion of the board of aldermen, and they were applied to in this instance to exercise that discretion in favor of this corporation. It was their duty, as public officers in whom a power of this description was confided, to exercise that authority for the benefit of the public, as well as for the convenience of the railway company. They were to look out for two things,—one was whether the franchise should be conceded to the company, and the other was what protection or what terms shall be imposed upon it for the purpose of the protection and the security of the public or of the city itself. But under the latter power they had the right to impose the payment of a bonus for the enjoyment of this privilege. They had the right to impose the gross sum upon the corporation seeking the possession of this franchise or privilege. The subject was confided entirely to them,—entirely to their discretion,—but when it was exercised it was to be exercised, not for themselves, but for the benefit of the city itself as a municipal corporation. They had no right—no authority—under the law, or any other law appertaining to their position, to insist upon the payment of one cent to themselves, or to any member of their body, for the exercise of this discretion or the concession of this privilege. Whatever they did they were bound to do as the representatives of the public, and, if the case was one where it was deemed proper or advisable to exact anything more than the statutory burdens which were required to be imposed upon corporations for the enjoyment of these privileges, it was their duty, as public officers representing the city, to exact that remuneration or that return for the benefit of the city itself. They had no interest whatever in the matter personally, but stood here simply as public arbitrators,—public officers,—who were to decide, as between the city and the railway corporation, what the railway corporation should pay to the city for the enjoyment of this privilege or of this franchise; and when it was understood, if it was so understood at all, that this Broadway Surface Railway Company was willing to pay a bonus of $500,000 for the privilege of constructing and operating the road in Broadway, it was the duty of these men to insist upon it that that amount should be paid, if in their judgment it was proper it should be exacted, and should be paid, not for their benefit, not for their use in whole or in part, but should be paid into the treasury of the city of New York. This is the position. This is the obligation that public officers sustain to enterprises of this as well as to other descriptions. They are not to have anything for themselves. Their salary is provided for, their perquisites are fixed, and whatever comes from the enterprise that is submitted to their consideration in the exercise of their discretion, beyond that, is the property or the remuneration or the subsidy of the principal itself that is represented by the officer, and for that, wherever a public officer may, in violation of his trust or in violation of his position, exact anything for himself over and above and beyond that which is contributed for the benefit of the public, he, like all other agents,—like all other trustees, as in fact these officers are,—is bound to pay over and account to the public treasury— to the city in this case—for every cent that is paid to them in order to induce or influence the passage or adoption of such a resolution as was passed in this instance. The money, in other words, does not belong to the agent. It does not belong to the officer. It belongs to the public, and, if the officer receives it, the public have the right to follow him, and oblige him to pay it over, and return it where it belongs,—to the public treasury. The rule is precisely the same where you employ an agent to exercise authority in your behalf in the disposition of your property, or in the purchase of property for you, or in any other pursuit. He has no right to make a private advantage for himself, but whatever he may obtain is for your benefit, and he is bound to account to you for it in the ordinary course of proceedings, and you have a legal right to follow him, and oblige him to do so. The same obligation precisely rested upon these officers. If there was anything to be paid over and above the statutory

requirement, as percentages upon the earnings of the company, it was to be paid to the city, and not to those persons who were engaged in making this concession.

This was the position in which these parties stood at the time when this act was passed, and when it was said it was contemplated that an application would be made by a railroad company for the right or the privilege of using Broadway for the construction and use of a street surface railway. The in-indictment charges that, in violation of this obligation resting upon the board of aldermen, to whom was confided the authority of giving this consent, that they made it the grant of a barter and concession to themselves of a pecuniary and financial character, and that this was the motive or inducement which, in part or in whole, led to the vote that was given, and the final adoption of these resolutions.

Now, in order to make out this part of the case, the witness Fullgraff has been placed upon the stand by the prosecution. It has been claimed and urged on behalf of the defense that his evidence should not be believed; that it should be entirely rejected by the jury, and not considered as a part of the evidence that is to be submitted to them for their deliberation and judgment here. Upon this subject, gentlemen, I have been requested to charge the jury on the part of the defendant these propositions, which I may as well read now, in order to avoid the necessity of recurring to them hereafter.

The first is: "Fullgraff, being a self-confessed, willful perjurer and informer, the jury, in their discretion, may reject his testimony altogether." I may say as to that, subject to the observations which will be presently made, that you have the power,—you have that right; but at the same time it is one to be exercised in the exercise of your judgment and belief, looking at the facts and circumstances attending the giving of this evidence, to determine, first, from that whether this testimony is reliable in any degree. If it is not, then it is to be rejected. If it is, you are to accept and act upon it, so far as you find it to be reliable in and of itself by reason of corroboration from other circumstances.

"And they may reject it altogether, whether they consider it corroborated or not." Undoubtedly that is the case, but you should not, gentlemen, arbitrarily or willfully reject the testimony of any person admitted for your consideration, unless in the exercise of your judgment; considering the testimony; considering its probability; whether it was in whole or in part a statement of the truth concerning which it related.

"If they do not consider it corroborated, as required by law, they must reject it altogether." Upon that subject, gentlemen, there seems to be a slight misapprehension as to what the statute is. The statute upon this subject does not require, and has not directed, that the evidence of an accomplice shall be rejected from the case simply because the jury may find the fact that he is an accomplice, or simply because he is identified with the commission of a crime concerning which his testimony relates, or because he has sworn falsely or spoken falsely upon some preceding action. The provision of the Code upon this subject which is now the legislative embodiment of the law is this: "A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other testimony as tends to connect the defendant with the commission of a crime." That undoubtedly, gentlemen, is the law which must be observed by courts and juries in considering the weight and effect and disposition of the evidence given by an accomplice. But in this case it is not claimed on behalf of the prosecution, and such has been the ruling concerning the testimony of this witness, and what transpired between these persons who are said to have been engaged in this combination, that his evidence tends in any manner to connect the defendant with the commission of this offense. It has no tendency whatever to bring about such a result, and consequently is not within the literal terms of this provision of the

Code.　What his evidence is directed to is not the connection of the defend-
ant with this transaction, not his connection with the guilt of the aldermen
by reason of the action taken by them, but his evidence is given for the sole
and only purpose of proving that there was a corrupt combination between
the aldermen themselves, and he was a party to that combination; that he
promised to join with the others, who were his associates, in controlling and
voting upon this subject; and that while he was convinced that the measure
that was proposed to be carried out was a just and proper one, yet, at the
same time, to use his own language, he concluded, as money was to be paid,
he would or should have his portion of it.　The testimony, you will see, there-
fore, relates wholly and exclusively, not to any connection of the defendant
with this case,—that depends upon other facts and other circumstances and
other testimony,—but upon what was resolved, what was agreed upon, by the
aldermen themselves, he being one of the parties to that agreement.　But in
reference to this subject, gentlemen, the law has always been, where a person
who has committed a crime is brought before the court and jury to give his
evidence, that the fact that he has been a criminal in any sense involving moral
turpitude is a fact to be taken into consideration as having bearing upon the
weight and effect which should otherwise be given to the evidence by the
jury.　In order to entitle the testimony of a witness to be absolutely received
as the truth concerning which practical action can safely be taken, he is re-
quired to be a man of fair character, of good habits, of reasonable integrity
and fidelity to the discharge of his duties.　Where such is not the case, but
he has departed from a life of rectitude, and committed a crime involving the
existence of moral turpitude or moral delinquency, that circumstance is to be
taken into consideration as a fact having a bearing in the direction of impair-
ing the weight and strength which his testimony would otherwise receive.
But it does not follow, because a person may have committed a crime ante-
cedently to the time he is examined as a witness, that his evidence is to be
rejected.　The law has imposed no such obligation upon courts and juries.
If it had, it would not have permitted the testimony of such a person to be
given.　What it requires is that the jury shall take into consideration the ap-
pearance of the man, his apparent intelligence, his apparent candor, and the
circumstances under which he gives his evidence, and consider at the same
time his previous delinquency, and then determine whether he has spoken the
truth or not; whether his testimony is entitled to any weight or effect; and,
if it is entitled to weight and effect in a diminished point of view, then to look
about the case, and see whether there are corroborating circumstances that
will tend to bolster up the position of the man, that will tend to prove in any
way, notwithstanding his character and previous misconduct, that he, while a
witness in the case in controversy, still has been speaking the truth.

The law, as it existed a few years ago, where a person was convicted of any
crime,—simply the crime of stealing $30,—and was sent to the state prison
for punishment, he could not afterwards be permitted to be placed upon the
stand and give his evidence in any case, either civil or criminal.　So it was
the common law that a person interested in the event of any civil suit brought
before a court and jury should not be entitled to give his evidence because his
judgment, or his recollection, or his testimony might be swayed or affected
by the existence of that interest.　The legislature of the state, deeming that
the rules and the laws were of too great severity, and stood in the way of the
proper administration of the laws, has interposed and swept away these pro-
visions, and now any person who may be interested in a civil suit may be
sworn and examined as a witness, but the jury are to consider his testimony
as having some bearing upon the case.　So that a person who was convicted
of a criminal offense, it is provided by the statute, may now be placed upon
the stand as a witness, and the jury shall consider the fact of this offense, the
previous conviction, and the punishment of the witness, in order to deter-

mine how much weight they will give to the evidence he has given upon the stand. That is the law. It has been deemed more reasonable than the pre-existing rules to submit these questions entirely to the consideration of the jury. Let them look at the case, let them look at the witness, and consider the statement that he has given, the motive under which he may have been influenced, for the purpose of determining whether his testimony is reliable, or whether it should be rejected and thrown entirely out of the case. That is the position in which this man Fullgraff now stands, and for that reason, gentlemen, you will see that these propositions to this extent, as to the duty of the jury to reject the testimony of such a witness, is unfounded. It is the duty of the jury, on the other hand, to listen to his testimony, to consider his condition,—his relation to the subject-matter of the indictment, and the state-ment made by him,—and then determine, in the exercise of their good judg-ment, after bestowing this attention and care upon the testimony of the wit-ness, as to whether it is entitled to credit or not. If they believe it entitled to credit, or any credit, it is their duty to give it that degree of credit in the disposition of the case. If they believe it is not entitled to any, in any re-spect whatever, in the exercise of their fair deliberation and judgment, then they have the right to reject it,—indeed, should reject it.

"The evidence required to corroborate Fullgraff's must be something more than mere circumstances which may excite suspicion. It must be legal evi-dence, which, independently of Fullgraff's testimony, tends legitimately to prove that Fullgraff was bribed, and bribed in the particular manner which he describes himself, by defendant, or by defendants and others acting in con-cert for that criminal purpose." In the main, gentlemen, that proposition is undoubtedly true, and would be entirely true, leaving out the reference to the defendant, who is not shown by this part of the case at all to be impli-cated in this proceeding.

"Whether or not Fullgraff's testimony is corroborated, within the meaning of the foregoing request, or is to be rejected with or without corroboration, is a question of fact, absolutely and exclusively within the province of the jury, and for them alone to decide." I have already so said.

"If the jury find that Fullgraff, on his trial, willfully testified falsely as to any material part of his story,—as, for instance, as to the amount of money he received, or as to what was said and done at the meeting at his store, and the object of that meeting,—they should reject his testimony altogether." That is not charged, gentlemen, because it imposes in terms an absolute obli-gation on the part of the jury to reject the testimony. It is a matter over which you are to exercise your judgment. If you believe he has not sworn truly upon the trial of this case, then undoubtedly it is your duty to reject his testimony. But if you are satisfied that he has, as to material circum-stances to which his attention has been called, sworn truthfully, then his evi-dence is to be relied upon and given so much weight and effect as you believe, in conformity with all the facts in the case, it is entitled to receive. Now, his testimony with reference, as he himself says, to the gathering which took place near the time, and probably before the time, when this act of 1884 was passed, when they had this informal meeting, as he says, in the room of the board of aldermen, followed by the meeting at his store a short time after-wards, in which was talked of between them that they should act together on the subjects coming up and requiring the consideration of the board of alder-men, his testimony is that there were 12 or 13—I think 13—present, who would constitute a majority of the board, and that majority would be able to control the disposition of questions that might be brought up of the character of that which is involved in this transaction. His testimony is, further, that they met on three or four occasions subsequent to this time, at the house of Mc-Loughlin, and this subject was further talked over there, and it was stated, while they were in attendance at the first two or three of these meetings,—at

perhaps at the second and third,—that the Broadway Surface Railway Company, which at that time had become an incorporated body, was willing to pay the sum of $700,000—that is the amount he stated—for the right of privilege of constructing, operating, and maintaining a railroad on Broadway; that another railroad, the cable company, was willing to pay $750,000; but inasmuch as theirs was only to be half cash, and the rest in bonds, the other was considered preferable. He afterwards had his attention called to this subject, and stated that he had made a mistake as to the amount; instead of being $700,000 that was to be paid by the Broadway Surface Railway Company, it was to be $500,000; and that it was upon this basis, and upon this understanding, that the combination was made between himself and his associates, by which their votes should be rendered at the time when this subject should enlist the attention of the aldermen. Now, if this is true, there was such a combination made between these persons as would be in violation of the statute under which this indictment has been found. It was a combination or an agreement by which they bound themselves only to vote for the concession of this privilege to a railroad company to construct a railroad upon Broadway when they should be influenced or induced or led to it by reason of financial influences and financial rewards of the description of that mentioned by him. This would be sufficient, so far as these persons are concerned. So far as he himself is concerned, it tends to sustain this first part of the indictment, and establishes the fact that there was this corrupt agreement made between themselves that they would withhold their votes, or only give their votes in case they should be influenced and induced to do so by the reason of reward in this manner to be supplied. On the part of the defense it is stated that this man's testimony is not entitled to credit, for the reason that he has been contradicted by Mrs. McLoughlin as to the fact that there were no meetings of the aldermen at their house, such as he has related, at the times referred to by him. And Mr. Sullivan testifies that he was frequently in the house,—nearly every evening, if not every evening,—and that no gathering of this kind took place while he was there; also the testimony of Wendel, who says he was not there, and I believe it is not contended that he was; also the testimony of Cleary, who seems to have been included within the testimony of Fullgraff as one of these 13 aldermen. He states that he was not there in connection with any meeting of this kind, or upon any occasion. You, of course, gentlemen, are to look at the peculiar manner in which these witnesses have given testimony, for the purpose of determining whether you are satisfied from the evidence they have given that Fullgraff has sworn falsely as to these meetings at the house of McLoughlin. If no meetings took place there, then there is no evidence in this case that any corrupt or unlawful agreement was made between these persons at any place or under any circumstances; and, so far as that part of the case is concerned, so far as the indictment depends upon the statement of what took place at this house, it would remain without support, and that fact should lead to a verdict of not guilty, in favor of the defendant. It is important, therefore, you should look at this testimony, and look at what before and afterwards transpired, in order to determine whether this evidence that is brought up to contradict Mrs. McLoughlin is entitled to this degree of weight and effect. Mrs. McLoughlin says the meetings could not have taken place without her knowledge. Is she right? Mr. Sullivan repeats substantially the same thing. That is their judgment as to what transpired, or what they believed to have transpired, within the range of their recollection, of their respective knowledge. Mr. Cleary, who is one of the persons who was stated to be in this combination, denies having been there, and denies having met with Fullgraff and the others at this house at any time whatever. Now, Mrs. McLoughlin says, in support of her position, that her husband required her attention; that she remained at her home to give him that attention, on account of the condition of his health; while on the part of the prosecution it is shown that he

came from Saratoga to the city of New York after they went up there, some time in the month of June, 1884; that he was down here attending the meetings of the aldermen; and that he was there on the occasion of the 30th of August, when this resolution was finally passed over the veto of the mayor.

These are circumstances, gentlemen, that require to be considered, and require to be weighed, upon the point whether Fullgraff is right in the statement that he has made, whether he was there and did meet with these persons upon this occasion, and whether these meetings could or could not have taken place without the knowledge of Mrs. McLoughlin, or without the knowledge of Mr. Sullivan. Of course, gentlemen, they could not, if Mr. Cleary was one of these 13, without his knowledge; and you have a right to take into consideration, as bearing upon his testimony, the fact that he is stated to have been one of these persons who were engaged in this combination, acting with them whenever any subject or action came up relating to the concession of this franchise or privilege to the railroad company. Beyond this, there is further testimony in the case to which, of course, you will direct your attention, tending to corroborate the testimony of Fullgraff. It is not to be lost sight of, gentlemen, that he has sworn falsely, as he testified he did, before the senate committee, and in that manner committed another crime in addition to the offense of bribery or entering into this combination of 13; but at the same time that does not necessarily exclude his testimony from consideration. You are to take into consideration his motive,—the impulses under which he was acting then and in giving his testimony here. Then, according to his statement, and what you can see of the transaction yourselves, he was endeavoring to repel any imputation upon his integrity,—bringing him into an unlawful combination such as is charged in the indictment in this case; while upon these trials,—because he has been examined on various occasions before, on other trials, as appears from his evidence, and the questions which have been asked in the course of the examination of jurors and of witnesses, he has been examined upon the same subject upon other trials, and has testified to the existence of this combination, and of the agreement between these 13 persons to always stand by each other, in order to control the measures that might be brought before the attention of the aldermen. Here you will see his position is entirely different from that occupied before the senate committee. There he was endeavoring to shield himself by the evidence from the imputation of criminal misconduct, while here he concedes the criminal misconduct to have existed and been participated in by him. But that is a circumstance to which you will give its fair weight and effect, for, ordinarily, persons are not induced to give testimony implicating themselves in the commission of crime where there is no foundation, or where it is an entire fabrication or figment of the imagination.

These are matters to be looked at and considered; and so is the circumstance that, by his testimony as a witness on behalf of the people, he secures immunity from further prosecution. That, however, does not depend upon his testimony in this case. When he was brought upon the witness stand in the first transaction, where he was examined as a witness, and his testimony was obtained from him, he had the right, under the law of the state, to interpose, in case a prosecution was instituted against him, to bring up the fact that he had been made a witness concerning the same transaction on behalf of the prosecution, and upon that interposition the law would not allow his case to be prosecuted against him. That is the statute. It is not necessary that an agreement shall be made by the public prosecutor with the witness in order to entitle him to this benefit or this result. The law gives it to him. If a person who is an accomplice in crime is placed upon the stand, and gives his evidence as a witness for the public, the prosecution have no right—they have no authority after that—to proceed against him, and prosecute or punish him for his participation in the offense. So you will see there he earned his

immunity from prosecution and from punishment on the very first occasion when he was examined as a witness, and stands here now, not in a condition where that inducement is held out to him, or where that inducement is promised to him either in fact or by the law.   That point has been passed.   He has earned his immunity,—he has earned his exoneration,—and that before he was called as a witness in this case.   So you will look at his testimony in view of all these circumstances, and then as to the course and conduct of these persons in the board of aldermen.

You have had at very great length laid before you all the proceedings which took place in the board of aldermen touching the claim that was made, or the application made, by the Broadway Surface Railway Company for the concession of this privilege, and you have been shown the action of the different aldermen upon the subject,—their different votes as these subjects came up for consideration; and it is claimed on behalf of the prosecution that the conduct, the action, and the votes of these persons who are said to have been engaged in this combination have been so uniform and successive in reference to these applications, and the disposition of the applications, as to furnish a circumstance indicating that Fullgraff and the other persons acting with him were acting in obedience to some arrangement—secret understanding—that had induced and bound these persons together to act together upon the disposition of these subjects.   As the votes have been read, they were taken, I believe, upon four different occasions:  In the full board of aldermen first, on the 6th of August; then on the 30th of August; then, after this second petition was presented, early in the month of October, until the final vote was taken, on the 5th of December.   The votes of the different aldermen have been read to you as they were given in the board of aldermen concerning the disposition of these two resolutions, and it is claimed on behalf of the prosecution that those votes demonstrated the fact that these individuals were acting and co-operating together, and that that action and that co-operation leads to the conclusion, reasonably and fairly, that they were induced to do this on account of some arrangement, agreement, or understanding previously made between themselves, which was to control their action.   Then, beyond this, you will bear in mind, as bearing upon this subject, the manner in which this meeting of August 30th was called, and the manner in which these 18 aldermen were got together for the purpose of voting upon this subject; their readiness to meet and devote their attention to this subject at the hour of 9 o'clock in the morning, which is said by Mr. Twomey, the clerk of the board, to be the earliest meeting held to his knowledge.  You will also consider what was sent in to the board of aldermen by the mayor himself.   There seems to have been after the vote of the 6th of August, upon the subject of this resolution, a constant struggle carried on between the mayor and the board of aldermen concerning the disposition of this franchise,—the mayor insisting that further and additional rights and privileges should be be exacted and secured on the part of the city, and remonstrating not only by his vetoes, but by other documents accompanying the vetoes, against the concession of this privilege to this Broadway Surface Railway Company, unless further compensation was secured for the privilege to the city of New York.   Now, these messages and these remonstrances were sent into the board by the mayor.   They were laid before these officers.   It has been claimed that they were not considered, and you will look, of course, gentlemen, to what was the object and design of these messages and these remonstrances for the purpose of determining whether or not it is not reasonable and fair to assume that the aldermen did consider these documents and these messages, and, notwithstanding the consideration given to them, that they still persisted in voting for the concession of this privilege, as the records show them to have voted from time to time, until, with certain modifications, it was finally conceded to the Broadway Surface Railroad Company.

Upon this subject it may not be unimportant or uninteresting to you, for the purpose of aiding you in your investigation and your estimate of the amount of weight to be placed upon the documents sent in to the common council by the mayor, to direct your attention to the section of the consolida-tion act relating to the conduct and action of the mayor and board of alder-men upon a subject of this description. This section is as follows: "Every ordinance or resolution shall, before it shall take effect, be presented, duly certified, to the mayor for his approval. The mayor shall return such ordi-nance or resolution to the board within ten days after receiving it, or at the next meeting of the board after the expiration of said ten days. If he approve it, he shall sign it. If he disapprove it, he shall specify his objections thereto in writing. If he do not return it with such approval within the time above specified, it shall take effect as if he had approved it. Such objections of the mayor shall be entered at large on the journal of the board, and the board shall, after ten days, and within fifteen days after such ordinance or resolu-tion shall have been returned to it, proceed to consider and vote upon the same." You will see, therefore, gentlemen, that it was the duty of the board to enter the reasons of the mayor upon their record, and it is for you to say whether that would probably have been done without it being understood and known what the objection of the mayor was to the concession of this privi-lege to this company, without exacting some further remuneration for the privilege for the city that was to give it and bestow it upon the corporation.

Another subject comes up in this connection, having something to do with the testimony of this witness Fullgraff,—that is, upon June 23, 1884, Mr. O'Connor, you will recollect, who was one of the aldermen, opposed the grant-ing of this franchise; introduced a resolution into the common council or board of aldermen, in substance, agreeing that that concession to construct a rail-road on Broadway should not be given unless it was first put up to a sale at auction; and that this was referred to a committee, and some time in the fall was reported against by the committee, and was rejected by the board of alder-men. Another circumstance comes up here. Did these persons vote for this reference? Did they vote to reject this resolution? The record has been read to you of the persons who did vote upon each of these occasions, and, if they voted together upon these two occasions, this is another circumstance to be considered by you upon the question as to the effect to be given to the testi-mony of this witness.

Another circumstance in this connection to be considered is the position in which the interests of the city would have been placed if this resolution of Mr. O'Connor's had been adopted. You can see either that, if the franchise had been put up for sale, before it could be sold it would be necessary that the board of aldermen should agree as to what concession should be made; they should concede the right of a company to construct, maintain, and operate a railroad upon Broadway, and the terms under which that should be done, so far as they could be prescribed in a resolution of this description. Then, if it was to be sold at auction, it would be put up to the highest bidder; for the company who would pay the most for the privilege, and bid the highest, to take the resolution, should get the privilege. You will see that there would have been no possibility of any corrupt arrangement, or corrupt combination, or any other power of disposition on the part of any of the aldermen, to have exacted for their own benefit, or for their own use, anything from any persons or any corporation who might bid, under such circumstances, for the enjoy-ment of the franchise. Upon this subject the law has provided this act of 1884: "The local authorities of any incorporated city or village to whom ap-plication, under the provisions of this act, may be made for consent to the construction, maintenance, use, operation, or extension of a street surface railroad, upon any street, road, avenue, or highway, may, at their option, pro-vide for the sale of, and sell at public auction, the franchise, subject to all the

provisions of this act, to so construct, maintain, use, operate, or extend such street surface railway."

You will see, therefore, under this authority, that if it had been put up in this manner, that whatever was bid for the enjoyment of this privilege or the use of this franchise would have been the property of the city itself. There was no intervening ground by which the aldermen could have been paid anything, either one or more of these 13, or all the 13 together, for the concession of this privilege; but every cent of the money that had been bid, under those circumstances, would have gone into the city treasury. Now, it is insisted, on the part of the prosecution, that this circumstance, that these persons were opposed to this concession,—were opposed to this resolution,—as a fact bearing in some measure upon the probabilities of the truth of the statement of this man Fullgraff, that they had previously entered into this agreement by which, for the consideration of the money that was to be paid to them, they were to make the concession of this privilege to the Broadway Surface Railroad Company.

There is another fact that is worthy of consideration, of course, in this connection, and that is that other persons always voted with them, to the number of 18, 20, and I believe, finally, 22, on this subject; and you will consider the fact of those other aldermen voting with them as a circumstance having something to do, of course, with the probability that might otherwise arise from these 13 acting together, and as a circumstance that stands to some extent in conflict with the statement of this witness. But his testimony is that upon this subject it was left to Mr. Moloney, who was the reading clerk of the board, or the clerk of the railway committee, to arrange with a sufficient number of additional aldermen to bring them into some arrangement by which, if the mayor vetoed the resolution, they could be relied upon to pass it over the veto. By this section of the consolidation act to which your attention has been called, you see that the law required a two-thirds vote to pass a resolution or ordinance over the veto of the mayor, and that would be at least 16 or 17 voting out of this 24. It was to meet this emergency, according to the testimony of Fullgraff, that this precaution was taken; that Mr. Moloney was to see the other persons, and bring them in some manner into the arrangement; that if the mayor, as it was feared he might do, refused to approve the ordinance and sent in a veto, that they could still pass it over his veto.

Another circumstance occurred near the time when this vote took place, and that is the statement which Fullgraff made, that it was said to him that the money was up before the time for voting arrived. This, of course, gentlemen, is not evidence against the defendant. It is, like all this other testimony that has been considered, bearing entirely upon the first branch of the indictment, whether there was such an agreement, such an understanding between those persons, and whether the event had occurred upon which, according to his testimony, they did agree and were to give their votes.

This, gentlemen, I believe is the situation in which the testimony has placed this witness, both documentary and oral, and it is for you to determine, looking at all the probabilities, except so far as the statement may derive more strength or credit from the evidence given upon the other branch of the case, whether you are satisfied of the fact that this man has stated the truth substantially upon these leading subjects to which his attention has been called, or whether his testimony is wholly or entirely unreliable. His attention was called during the examination to the minutes of a preceding trial, perhaps of the preceding trial of the present defendant, in which it is stated that he said that the amount of money paid to him was the sum of $18,000, and he states upon that subject, if it was so stated, that it was a mistake, and was corrected in the minutes. We have no other evidence upon the subject what the testimony was upon the preceding trial than the minutes themselves. They have been read. There has been no authentication further than that of the minutes,—further than the

fact that is recorded. It may have been recorded correctly, or it may have been a mistake, as Fullgraff says it was. You are to consider this as having something to do,—and how much it is entirely for you to determine,—with this debated and discussed question of the amount of credit, if any, that is to be given to the witness Fullgraff. Then there is the witness Brown. You will not overlook his testimony. Fullgraff says he was paid in large bills, some time in the fall, the latter part of October, or after the vote was finally given, —and the rest early in the next year. On the 5th or 6th of February, 1885, a loan was made through Brown to the firm in whose employment he was engaged, and in making this loan it is stated by Fullgraff, as well as by Brown, that large bills were paid over of $1,000 and $500 in denomination. This is another circumstance relied upon by the prosecution as tending to sustain the general correctness of the statement of this witness, as he has claimed under the solemnity of his oath to detail what took place on these different occasions after this unlawful combination is said to have been made. Of course, gentlemen, if this part of the case is not made out, then the indictment necessarily fails, and the defendant is entitled to a verdict. But if you are satisfied when you come to look at it, and consider the testimony of Fullgraff, and all these different facts and circumstances, and of this transaction with Mr. Brown, and of the evidence which is further to be considered tending to connect the defendant with an unlawful combination of this description, that such a combination did exist, and that these men were bribed to vote upon this resolution,—if you are satisfied that that is the case,—then, of course, it becomes necessary to look carefully and deliberately at the evidence that has been given to connect the defendant with this combination.

It is not contended, neither is it necessary that it should be, that an absolute agreement should have been made between the defendant and these delinquent aldermen, for the purpose of making him criminal under the statutes of the state in this respect. That is a part of the case that the prosecution relies upon as far as to make out to your satisfaction, and it is for you to determine, gentlemen, whether it has been so made out or not. Now, the law upon this subject, and under which this indictment has been found, has provided in these words, that "a person who gives, or offers or causes to be given or offered, a bribe, or any money, property, or value of any kind, or any promise or agreement therefor, to a judicial officer, juror, referee, arbitrator, appraiser, or assessor, or other person authorized by law to hear or determine any question, matter, cause, proceeding, or controversy, with intent to influence his action, vote, opinion, or decision thereupon, is punishable by imprisonment for not more than ten years, or by a fine of not more than five thousand dollars, or both." By another provision of the statute it is not necessary that the defendant himself should have manually made himself a party to this combination. It is sufficient, in order to inculpate him, to bring him within the range of this indictment, if he directly or indirectly, through the connivance of one or more persons, became a party to this unlawful combination, and supplied the money for the purpose of carrying out the arrangement, to bring him within the fair range and purview of the indictment. The law, in other words, does not require that he should meet with these confederated aldermen, if such they were, or that he should hold personally any negotiation, or enter personally into any arrangement, directly with them. It is sufficient that this work may have been carried on through the instrumentality of one or more intermediate agencies. If he was the person who was behind, or one of the persons who were behind, to bring about an arrangement with these men that they should be paid this sum of money for their votes if they would give the franchise to the Broadway Surface Railroad Company, that would be sufficient, within the terms of the law, to render him culpable under the indictment. Upon this subject, perhaps, I can do no better than to read in your hearing another provision of the Criminal Code, and that is this:

"A person concerned in the commitment of a crime, whether he directly commits the act constituting the offense, or aids or abets in its commission, and whether present or absent, and a person who directly or indirectly counsels, commands, induces, or procures another to commit a crime, is a principal;" and as such he has been charged in this indictment.

Now, gentlemen, if this unlawful combination was made between these aldermen, that they would only vote for the concession of this franchise to the company upon being paid this or some other large sum of money, and this was the agreement under which these votes were given on August 6th and on August 30th, then from whence came the consideration by which these men were induced to give these votes and perform this agreement of confederation which took place between them? It, of course, did not come from a disinterested source. A person having no interest to subserve or no advantage to promote would not be expected to be connected with an arrangement of this description, but you would expect, naturally and logically, that if there was such a combination, if such an agreement was directly or indirectly entered into, and the mode of rewarding the aldermen for their unlawful conduct was supplied, by whom was it expected to be supplied? From what source would it naturally be expected to come? Why, only and solely from some source or some individual, or from some corporation, whose interest was to be subserved, advanced, and promoted by the concession of the privilege.

In this connection, for the purpose of enabling you to look at the very outset of the case upon this point, you have all the proceedings of the meeting of the Broadway & Seventh-Avenue Railroad Company held on the 13th of May. That was the day after which the Broadway Surface Railroad Company was organized, and upon that occasion,—and you, of course, gentlemen, will bear in mind, and carry with you in the course of your deliberations, what was said and what took place upon this occasion, as having some indication, or some bearing, upon the probability as to where this corrupt or unlawful reward was to come from or to be provided by, if it was to be provided, inducing these men favorably to vote upon this resolution upon this occasion. Upon this occasion, it is a part of the minutes of the meeting of the Broadway & Seventh-Avenue Railroad Company that Mr. Foshay, who was the president of the company, stated to the meeting that, in order to promote and secure, and prevent from injury—this is the substance, I believe, and you can take the proceedings of the meeting with you—from injury, or from any competition, that he had united with other persons to form a corporation for the construction and operation of a railway upon the surface of Broadway. This is substantially his statement, and this was considered, according to the testimony, you will recollect, of Mr. Alfred Wagstaff, as a very important subject, employing the consideration of the directors and the officers of this Broadway & Seventh-Avenue Railroad Company, because his statement was broad and unqualified that if another company should secure this franchise, that should not use it in co-operation with or promoting the interests of the Broadway & Seventh-Avenue Railroad Company, that it might, and probably would, diminish the earnings of that company, diminish the revenues and dividends that had been before received on the stock of the company, and that they deemed it, therefore, important that what could be done should be done in order to gain the control of the company that might be permitted to construct the road upon Broadway. It is stated, further, that an agreement could be made and entered into with the Broadway Surface Railroad Company, which was then a corporation, by which the cars of the Broadway & Seventh-Avenue road should be run over the tracks of this new company, and that passengers should be carried from the Battery to Broadway by the common use of the tracks of both of these companies. Now, here you will see, in the outset of the proceedings, soon after the organization of this new company, before this application was made to the board of aldermen, that this was made a com-

mon object of interest,—a common object of discussion,—to be provided for, and that the president, Mr. Foshay, said he had united with others to bring about substantially this result. This, of course, is a circumstance standing by itself; and it is for you to say, looking at the other things that occurred,—the other circumstances which subsequently took place,—whether this is or is not the key to the situation, if the aldermen were bribed, showing where the money would probably come from to pay them for their criminal and delinquent action.

You proceed upon this consideration a step further, and at a meeting of the Broadway Surface Railroad an agreement of this kind is stated to have been an agreement which they were willing to make. This was ratified and confirmed finally, and executed on the part of the Broadway & Seventh-Avenue Railway Company, and it was stated in that agreement, at this early day, —the 17th day of May, I think, is the date of the agreement,—that the Broadway & Seventh-Avenue Railroad Company, in consideration of the privilege secured by the means of this agreement, should have the right to run its cars over this Broadway Surface Railroad, and that the Broadway Surface Company should have its right to run its cars over the Seventh-Avenue road. This was by a later agreement, not important to be considered here, further explained and further arranged, by which the number of cars to be run by the Broadway Surface Railroad Company was reduced to five, substantially giving the entire control of this road to the Broadway & Seventh-Avenue Railroad Company. By this agreement it was stated that in further consideration of the agreement entered into, that the Broadway & Seventh-Avenue Company should provide depot and stable accommodation for the cars and horses of this Broadway & Seventh-Avenue Railroad Company. I may not, gentlemen, state the terms of this instrument entirely literally, but you will be at liberty to take the papers yourselves, and look at them for yourselves, and see precisely what was the language made use of and employed in making this agreement. Then you proceed still further in the course of the history of this business, and in the month of June, 1884, a petition is presented by the Broadway Surface Company to the board of aldermen, asking the privilege or the franchise of constructing and operating this railroad upon the surface of Broadway; and about that time, or soon after that, at least, an arrangement seems to have been made for lithographing bonds for the Broad- & Seventh-Avenue Railroad Company, and on July 22d the meeting which has been so often referred to in the examination of the witnesses was held, when the resolution was finally adopted. It was presented and adopted, provided that $500,000 of bonds should be made and issued, secured by a mortgage upon which money should be raised to enlarge the depot of the Broadway & Seventh-Avenue Railroad Company, and to furnish stable facilities and others for the use of this Broadway Surface Railroad Company. This is an important step, gentlemen, taken in the course of these proceedings,—an important circumstance,—to be carried by you in your recollection, and to enter into your deliberation upon the question as to whether the defendant has been connected with a transaction of the description of that mentioned by this witness Fulgraff in his testimony. These facts and circumstances, if they tend to throw credit upon the testimony of this witness, or to confirm the probability of what he has stated, are to be further considered as evidence having bearing upon the probability of whether he has sworn to the truth in the testimony given by him on the witness stand in the course of this trial.

After this resolution was passed, on July 22, 1884, and these bonds were lithographed and ready for use, they were put upon the market; and you will recollect that this subject was to come before the committee or board for consideration on August 5, 1884. The statute required 14 days' previous notice of the consideration of this subject. The bonds were put upon the market. It appears by the evidence of Mr. Prentice that Mr. Foshay, the president of

the road, and Mr. Kerr, who was the treasurer and the secretary of this road, were present at this office to arrange with him concerning the disposition of these bonds, and the raising of this sum of $500,000. You, of course, are to consider the period of time when these bonds were brought upon the market. At this time the Broadway Surface Railroad Company had not acquired either one of these consents. They had no right to disturb even a stone or a spadeful of earth upon the route which this railroad company desired and hoped to be able to construct the road upon. But this was all in the future. Either the property owners would not consent, the commissioners would not favorably report, or the courts would not confirm their report if they did, or the aldermen would not give them the right or the privilege to construct a road on Broadway. You are to look at these surrounding and attending circumstances for the purpose of determining the probabilities of what was the motive actuating the persons who were concerned in this transaction in bringing about this arrangement for the sale of these bonds at this time, to see whether at this period of time there was any need of the enlargement of the depot,—any need of supplying additional accommodation for the horses and cars of the new company who were expected to run their cars from Fifteenth street to the Battery. Was there anything, or is there anything, in this case showing the inadequacy of the present state of affairs in July, 1884, of the Broadway & Seventh-Avenue Company for the accommodation of all horses and cars that might be brought additional to their stables in the construction and operation of this road? These are questions which are important to be considered in this connection, because of the time when this resolution was passed, and when it was provided that these bonds should be placed upon the market, and this sum of $500,000 should be raised.

You will see here, gentlemen, for the first time, a coincidence between what is stated by Fullgraff to have transpired between himself and his alleged confederates and the business of this Broadway & Seventh-Avenue Railroad Company. His statement is that they were to have $500,000. This resolution is that the company should raise $500,000, and the resolution further provided that bonds of the first mortgage which were then in the treasury of the Broadway & Seventh-Avenue Railroad Company should be made use of as a means of floating these second bonds, in case they could not be otherwise sold. There were 178 of these bonds, of $1,000 each, at that time in the treasury of the Broadway & Seventh-Avenue Railroad Company, and a portion of these bonds, at least, it was contemplated, might be required for the purpose of putting the second mortgage bonds upon the market, and raising this sum of $500,000. Is there anything in the case indicating that precisely $500,000 would be necessary to enlarge the depot, or to enlarge the stables, and supply these additional facilities mentioned in this contract of the 17th of May? Is there any proof in the case that it was requisite for this purpose that precisely this sum of money should be raised? There seems to have been an apprehension on the part of the officers of this company that out of the $500,000 in bonds there might be an inability to raise $500,000 in money, and hence these additional provisions provided for the contingency of bringing in the first mortgage of the company, 75 of which are shown to have been used in putting these second mortgage bonds upon the market, and in that way raising this precise sum of $500,000. On the cross-examination of Mr. Prentice, who was one of the members of the firm who was employed for the purpose of negotiating a sale of these bonds, it is shown as a matter of fact that the market at that time had been deranged—had been depressed—by the failure of Grant & Ward, of the Marine Bank, and of several other responsible and well-known financial institutions; so that it was not an easy thing, according to his testimony to put a second mortgage upon the market, and realize what might have been expected, by the party issuing the bonds, to be derived from it in the way of financial results.

Why, then, gentlemen, in this state of the market, depressed as the witness states it to have been in this manner, should these bonds have been placed upon the market simply for the purpose of providing the fund, according to the resolution, for enlarging the depot, and supplying additional stable room for the cars and horses of this newly-formed company? This is a question that must suggest itself to you in the course of your investigation in this case. Why, at this time, was it necessary to put these bonds upon the market, and add to them these 75 bonds, secured by their first mortgage of the company, in order to raise this sum of $500,000? Then you will recollect, from the testimony of this witness, the further statement that the negotiations were carried on at the office of his firm for the sale of these bonds for his interposition and assistance and service by Mr. Foshay and Mr. Kerr, the defendant in this case. They were the president and the secretary of this Broadway & Seventh-Avenue Railroad Company, and with them the terms were arranged, according to the testimony of Mr. Prentice, on which these bonds should be sold. I should add one thing further, gentlemen, by way of explanation, and that is in reference to the statement or the testimony of witnesses, that you are not to rely upon my recollection, or upon the impression that the evidence may have produced upon my mind. But you will judge entirely of what the evidence is by your own recollection, and give it such weight and effect, under the circumstances, as you believe it to be entitled to, in your independent recollection of what transpired while these witnesses were examined upon the stand during the progress of the trial.

But, as the evidence impresses me, this is the substance of it: First, it was expected to sell these bonds with a bonus of 12 of the first mortgage for every $100,000. That did not meet the approbation of the broker, and it was increased to 15 bonds for every $100,000 of the $500,000 bonds, and they were subsequently put off on the market in this manner. The defendant and Foshay, according to his testimony, were there at his office looking after this business. They were engaged to some extent in conversation and negotiation with persons who bought bonds. They received the checks or the moneys for which the bonds were purchased. When the checks were received and made payable to the defendant, they were indorsed by him in his own handwriting, and the money was raised upon these checks, as it is stated in the course of the examination of several of the witnesses, that the money was raised in large bills; and this, of course, is another coincidence existing in reference to this part of the case,—for you will recollect the testimony that was given in order to corroborate the statement of Fullgraff, that the money was paid in large bills, by the other witnesses that they possessed these large bills. De Lacey had them, and also Miller. Other persons had them, buying United States bonds in one instance, and paying off a mortgage of $4,000 in another instance; and also the transaction with Mr. Fanning, who was not able to denominate the bill, but states that the package received by him was a small package, somewhere about $10,000. Each branch of the case has more or less some reference to the other; the aldermen being found with these large bills; the defendant and Mr. Foshay, in their negotiation of these securities, obtaining large bills. Of course, it does not follow that simply because of a coincident circumstance of this character that these different branches of this case are so knit together as to sustain this indictment. They are simple circumstances,—circumstances which, if they stood alone, as was illustrated by one of the counsel for the defense in his argument and in the opening of the case, would not be accepted as proof of the guilt of a person who is found in possession of bills of such a denomination. You are the judges, gentlemen, as to the weight and effect to be given to all the evidence. It is for you to determine, as it strikes your mind, in view of the probabilities and in view of the circumstances, how much weight it ought to have, and how much weight you will give to it in the decision of the case. You have

these circumstances—the making of these bonds, the making and recording of the mortgage, and the raising of the money prior to the time when this transaction was to take place before the board of aldermen, on August 5, 1884, —as circumstances to some extent bearing upon the question whether this defendant is shown to have been connected in such a transaction or in such a confederation as is stated to have existed between these aldermen by the testimony of this witness Fullgraff. It appears after this occurrence,—after this August 2d, when most of the money was raised,—the 3d or 4th of August, when the last seems to have been received,—after this the vote on the petition of the Broadway Surface Railroad Company is taken, and the next day after hearing the argument it is adjourned over until August 6th, when the subject comes up, and this matter is passed by a vote of the majority of the aldermen.

It is as to this circumstance, as well as to the succeeding vote, on the 30th of the same month, that your attention has been especially directed, as indicating a probability that this money was raised with this haste, under these circumstances, not for the purpose of enlarging the depot, or furnishing greater accommodation for the cars and the horses, which it is conceded never has been done to this day, but for the purpose of raising the sum of $500,000 to meet what was claimed or demanded by these members of the common council before they were willing to vote for the concession of this franchise. In this connection, and in reference to all that subsequently transpired, you will still bear in mind that the defendant was the treasurer, and the person apparently co-operating with him immediately was the president, of this company. Other persons who signed the articles of association of the Broadway Surface Railroad Company, and who were present at the times when these different votes were taken upon the subject of raising this $500,000, have been interrogated, but they are not the persons apparently who participated actively in either branch of this case. It was committed, on the other hand, to the management of the officers of the corporation; and, wherever anything has transpired in reference to it before the board of directors of the Broadway & Seventh-Avenue Railroad Company, according to the minutes that we have of the meetings, the suggestions or directions of the president of the company, Mr. Foshay, were generally carried into effect.

Now, it is insisted further, on behalf of the prosecution, that the fact that this money was not used to enlarge the depot or furnish increased facilities for the cars or the horses of the newly-formed company, that that was no part of the design of raising the money, of entering into the agreement with the Broadway Surface Railroad Company, or of providing for the issuing of those bonds by the resolution of July 22, 1884. It is insisted, because this was not done,—was not attempted,—and only the sum of $3,000 paid for work upon the depot, which was drawn from another and different source, that this was a mere pretense on the part of the persons who were engaged in this business, declaring the object to be to raise the money for another purpose, when in truth and fact it was intended to be used only for another purpose. How much there is in this point, or how much there is in any of these points, is entirely a matter for your consideration. It is for you to determine the case upon the evidence, and upon the evidence alone, as it strikes your mind, and to adopt and act upon only inferences and conclusions as you, in the course of the exercise of your mind, shall deem to be justly deducible from these facts and circumstances.

It has been affirmed in behalf of the defendant that this mortgage was recorded, and that these bonds were authorized by the open and direct action of the directors of the Broadway & Seventh-Avenue Railroad Company. That, undoubtedly, is the truth; but that, gentlemen, is not the controversy here. This mortgage is openly recorded. It is there where every person can see it. The minutes of the company show that the bonds and mortgage were author-

ized, but the controversy here is not as to the bonds and the mortgage, but what became of the money. There is where the controversy hinges, and it is upon that circumstance that your attention is directed to the subsequent history and proceedings of this corporation. In addition to the fact that the money was not used for either of these purposes mentioned in the contract or resolution, you have the additional circumstance that this road continued to run along until some time in the year 1885, before the right was acquired of constructing and operating a railroad upon Broadway; and during that intermediate period of time it is urged, as a circumstance on behalf of the prosecution, that no account whatever, or no rational account, has been given of the condition and situation of this $500,000. Where was it? What did become of it? Where did it go? The company, as stated by the witness Ramsay, is said to have two bank-accounts,—one in the Broadway Bank, and the other in the Pacific Bank. The amount in the latter was for the purpose of meeting the interest that would accrue from time to time upon the bonded indebtedness; the other, for the purpose of meeting and carrying on the ordinary affairs of its business, where its usual deposits were made; and yet, according to the testimony here, no part of that $500,000 went into either one of these banks. Did it go into any other bank? If it did, is there any evidence in the case tending in any manner, or showing what the bank was, or any other depository? It has been stated, and undoubtedly the fact has been truthfully stated, that Mr. Foshay had a compartment in a safe-deposit company, but has it been shown any part of this money went into the safe-deposit company, where it would naturally go awaiting the use of it, if it was to be used in accordance with the resolution in reference to the enlarging °of the depot and extending the stable accommodations? Is it, on the other hand, as the prosecution has urged, a fact of more or less significance in the case that no bank-account seems to have contained any part of this $500,000, and that no deposit is shown to have been made of the $500,000 either in the safe of the company or in this safe-deposit company? Where did it go? This is a significant question, that addresses itself to your consideration. Did it remain in the hands of the defendant in this case, who was the treasurer of this company, or was it in point of fact placed in the hands of some depository between these 13 aldermen, until the time should elapse when a final vote should take place upon this resolution, and the company should be secured this right to construct, and maintain and operate, its road upon Broadway.

Another circumstance that has been referred to in this connection, and is brought into the case by the testimony of Mr. Ramsay, who you will recollect was the auditor and previously the bookkeeper of this company, is these monthly statements which have been read in your hearing,—the monthly statements of the Broadway & Seventh-Avenue Railroad Company,—and they have extended from July, 1884, until and including July, 1885. In these statements,—and these, of course, you will be at liberty to take with you,—in these statements is a statement of the amount of cash on hand, and at the same time no increase of that amount,—no allusion whatever, as a general thing, until late in the season, to this sum of $500,000. Then, besides that, after the close of the year 1884, the amount of cash on hand, according to these reports that have been read, continued to diminish. When the reports commenced it was upwards of $200,000, I think. When the month of December is reached, the balance on hand is found to be four thousand and some odd dollars, and in order, apparently, to meet the wants of the company at that time, the defendant loans to the company the sum of $5,000, and this is received and used, apparently, according to the book-keeper, in the course of its business. Now, this is a significant circumstance,—if this $500,000 was in hand, that it should not have been resorted to for the purpose of aiding the company in its emergency, and supplying it with the money which was needed, instead of borrowing it personally from the defendant in this case.

There is another suggestion bearing upon this, and that is, if the company had the money intact somewhere, they may have been disposed to keep it intact to meet the purposes for which it was stated it was raised, and those bonds were sold by the resolution of July 22, 1884. Again, reports were made to the railroad commissioners of the business and situation of this company, and then, according to the testimony of Mr. Ramsay, for the first time some allusion was made to the fact that these bonds had been sold, and this sum of $500,000 had been raised. You will recollect his testimony. You recall to mind what he said was the interview between himself and the defendant and Mr. Foshay, concerning this $500,000, and what was the result of the information or of the inquiries received by him, and whether that was a satisfactory explanation of the condition or situation of this $500,000 or not. These are matters, gentlemen, entirely for your consideration, to give them such weight and effect as you believe, under the evidence in the case, they ought justly and properly to receive. But beyond this, a resolution was adopted on November 17, 1884, or a statement was made at the meeting, referring to the fact that money had been expended in the promotion of this enterprise of the Broadway Surface Railroad Company. This was left entirely indefinite, and on the part of the prosecution quite an extended investigation took place for the purpose of showing that the moneys which had been expended by the Broadway & Seventh-Avenue Railroad Company, which were referred to in this statement of the meeting of November 17, 1884, including no part of this sum of $500,000, but was money that had been drawn in the course of their business out of their usual and ordinary bank-account. The vouchers were produced. The witness states that he obtained them from the files of the company. They were produced here, and he has given you what transpired, and what he says passed between himself and the defendant and Mr. Foshay concerning this subject, and the utmost extent of the explanation they were able to give concerning the $500,000.

Of course, gentlemen, you will draw your own conclusions as to the evidence of this witness, and as to the effect to be given to that evidence, and determine for yourselves whether there was any explanation at this time accorded to the person who desired to make entries on the books of the company concerning the deposit of this $500,000 that was consistent with or anything like a business arrangement, or whether or not it aided and assisted in sustaining the probability that the money had been previously used for some undisclosed purpose. Then further evidence is given here by this witness, and also by the witness Mr. Townsend, who was employed as an expert book-keeper, concerning the entries made on the books on June 30, 1885. Those entries you will recollect amounted to a balancing of the books for this $500,-000. The $500,000 is put down upon the books as so much money that the company had received for these bonds. Then, in order to meet that amount, certain charges are made upon the books by the book-keeper, as he says, from conversations between himself and the president and treasurer, to balance this sum of $500,000, and, as it has been stated, a handsome balance has been arrived at, made up by $47,000 of a check of the defendant himself. That is stated, however, to be drawn upon one of these banks of credit to the company where there was no deposit of this sum of $500,000, and it is for you to say whether that check consequently had anything to do with the raising of or the appropriation or use of this sum of money.

Then, further, is the sum of $230,000, which is charged against this $500,-000, for 600 horses and harness that had been bought by Mr. Newell under the authority of the railway committee, he being the superintendent, and the charge is made against this sum as the price for which those horses were purchased. In the course of the examination of Mr. Newell, who testified as to the horses, and as to their value would appear at that time, he thinks they were worth the sum of $250. It turned out afterwards they were not worth that

amount. That is not important in this case. What you have to do is with the valuation of the horses at the time when they were obtained,—at the time when their appearance indicated the value,—and the person who acted in this matter on behalf of the railroad company. But you will see, if you put the 600 horses at the sum of $250, as Mr. Newell puts the value, it fails to reach by a very large amount this sum of $230,000 charged on the books against the $500,000 in order to diminish the amount of money received on these bonds. Then, in addition to that, the contract has been read between Mr. Sharp and the Seventh-Avenue Railroad Company, by which Mr. Sharp was to have the stock, except what was subscribed by directors, amounting to the sum of one million of dollars, and the bonds of the Broadway Surface Railroad Company, the first mortgage amounting to another million, the second mortgage, I think, a million or a million and a half,—making nearly three and a half millions in stocks and bonds of this company that Mr. Sharp received; and for that, as the agreement has been read in your hearing this morning, he undertook to construct and equip this road. Now, if that was the obligation and agreement, and he did purchase these horses,—1,400, I think, as Mr. Newell thinks there were,—what would be required for the purpose of equipping this road, and furnishing the motive power, was probably horses that Mr. Sharp was bound to employ under the terms of this agreement, and, if that was the case, that would be another reason why they should not be charged up upon this account as part of this $500,000, or the proceeds of these bonds.

Another charge made against the 500 bonds to balance up this account is $50,000 paid to Mr. Ashbel Green. You will recollect his testimony, as he was a witness upon the stand. He testified that he was employed by the Broadway Surface Railroad Company to render services in its behalf, and obtain consents to the construction of that road, and that he did so, and charged this sum of $50,000 for it. Then he says that this money was paid to him by Mr. Richmond, and it was paid to him in bills or certificates of deposit amounting to the sum of $10,000 each. Then the testimony further is that Mr. Sharp on the 18th or 19th of June received from Vermilyea & Co. an amount of money exceeding $800,000 for the sale of Broadway Surface Railroad bonds, and that he gave to Mr. Richmond a check exceeding the sum of $155,000, and that was certified by the bank upon which it was drawn; and the officer has testified here that he paid to Mr. Richmond $10,000 bills of these gold-deposit bills or certificates, as they are called, at the time when this check was presented; and it was on the 22d of the same month of June, 1885, just eight days before these entries were made upon the Broadway & Seventh-Avenue books, that these bills, five in number, of $10,000 each, were handed over to Mr. Green.

Now, you will see yourselves, gentlemen,—and, of course, you must exercise your own judgment upon the subject,—whether this was a proper charge to be made for the purpose of diminishing this fund of $500,000. The same is true as to the bill of Robinson, Scribner & Bright, amounting to seventy-six thousand and odd dollars. The testimony of Mr. Bright is, as I recollect it, it was paid to him by a check received from Mr. Sharp, and it was for legal services performed by them in endeavoring to obtain these consents, and otherwise in the course of the proceedings of this Broadway Surface Railroad Company. Did this have anything to do with the Broadway & Seventh-Avenue Railroad Company as a disbursement out of the $500,000? Then you have the testimony of Mr. Waters as to the $2,500 paid to him. He says he was a surveyor that was employed to look after the construction of this road, and the manner in which the streets were opened and preserved, and that this was not paid to him by this company, but was paid by one of the officers of the Broadway Surface Railroad Company. This is charged up as against this sum of $500,000. Then there is the account of Mr. Bliss, amounting to the sum of $11,500. Mr. Bliss says he was employed by Mr. Richmond; that he

received in cash, at or near the time he was employed, the sum of $1,500, and when the employment came to an end there were delivered to him 10 of the $1,000 bonds of the Broadway Surface Railroad Company, and in that way this sum of $11,500 was paid to him. The question arising here is whether this in any manner could be made a proper charge against the $500,000, and that, of course, depends upon the further fact whether the bill was paid out of that sum, or whether it was paid by a different and entirely separate source.

Then there was the amount of money that was paid to settle this suit of Lyddy's concerning the injunction,—$12,500 more. That is charged up against this $500,000 on the books of this company.

*Mr. Semple.* That was paid out of the $30,000.

*The Court.* Then, gentlemen, leave that out. That was paid, as appears, out of the sale or the proceeds of 30 of the first mortgage bonds of this company. It is for you to say, looking at these accounts,—this statement of accounts, the charges made against the $500,000 to balance it, including this check of the defendant himself of $47,000,—as to what this means; as to its correctness; as to the motive—the object—in disposing of and balancing the account in this way. Was it a truthful balance? Was it a truthful mass of charges against the $500,000? Was the $500,000 used in whole or in part in this manner? If it was not, and these charges were unfounded,—if these charges were fictitious, and made for the purpose of creating a balance where in the nature of things it could not be created,—it is a circumstance for you to take into consideration as bearing upon the question, what was the deposit of this sum of money? Where did it go? That is an important question on this part of the case. Was it used for the purpose of corrupting these aldermen, and inducing them to act together, and give their votes as they did, or has it been used for some other or different purpose?

Now, I have been asked on this part of the case, in these requests which I shall further read to you presently, to say to you that the defendant is not bound to account for or explain, by testimony on his part, the absence or the disposition of this $500,000. Ordinarily, gentlemen, where it is in the power of a party to account for the existence of a fact of this description, and he fails to do so, the failure or omission is a circumstance to be taken against him and to increase and augment the proof or the strength of the other facts; but in this case I do not think that you should draw that conclusion, or make use of that presumption against the defendant. And for this reason it appears by the evidence in the case that Mr. Foshay, who was with him at the time when this business was being transacted, certainly to some extent, is dead, and accordingly cannot be put upon the stand. The defendant himself is not bound to go upon the stand, and no inference can be drawn in this case against him because he has not gone upon the stand to give this explanation, or to give any other; and for that reason I think, under the circumstances presented here, you are not at liberty to consider the evidence which has been produced as in any respect strengthened against the defendant because of the omission to explain what may have been the disposition of this money. It is because the means of explanation, so far as Mr. Foshay is concerned, have passed out of existence, and because he himself is not bound to take the stand, and no inference can be drawn against him because he has not taken the stand to make this explanation.

Now, gentlemen, I will read the rest of the requests presented by the counsel relating to this part of the case, and to the effect of the proof that we have already been considering:

"That the jury cannot find the defendant guilty, as charged in the indictment, without proof beyond reasonable doubt that he knowingly and intentionally paid or participated in the payment of a bribe to said Fullgraff, for the purpose and with the intent alleged in the indictment; and that it is not enough to show suspicious circumstances sufficient to show that defendant

knew that such a bribe was paid, or intended to be paid, by others, unless it be satisfactorily shown that he participated in the act with the intention charged in the indictment." I think I have already suggested that to you, and endeavored to make it as clear as the proposition itself states it; and that is undoubtedly the law.

"Proof of the intent is just as essential as proof of the fact itself of giving or offering money." That is undoubtedly the truth. The essence of a criminal offense in all cases consists of the intent. There must be an unlawful—there must be a criminal—intent, and before the defendant may be convicted under this indictment he must be found to be actuated by such an intent; and not only actuated by the intent, but in pursuance of it to have contributed in some form, either directly or indirectly, to this money going into the hands of the aldermen. or into the hands of Fullgraff, for the purpose of influencing him in the giving of his vote.

"The intent, which is an essential element of the crime, and must be proved beyond a reasonable doubt, is an intent to influence Fullgraff contrary to his duty as an alderman." That undoubtedly is so.

"The jury must acquit the defendant, unless they find that his motives were corrupt, and that he corruptly participated in the offering of money for the purpose of influencing Fullgraff contrary to his duty as a member of the board of aldermen." That is substantially a repetition of the other, and is, of course, equally true.

"If the jury find that the alleged bribe was not paid or offered for the purpose of corruptly influencing an alderman, and seducing him from the performance of his duty, they must acquit the defendant; in other words, before they can convict the defendant, they must find that he corrupted, or attempted to corrupt, Fullgraff." That is the same thing, and, of course, is correct.

"The defendant is not here called upon to explain or account for the disposition of the $500,000." I have already explained that.

"The prosecution must prove affirmatively and beyond reasonable doubt that these $500,000, or some portion of them, were raised to influence the aldermen to act contrary to their duty, and that the defendant, with guilty knowledge and corrupt motives, actively assisted and aided and abetted in raising the money for that purpose, and with the intention that it should be used for that purpose." I have already read to you, gentlemen, the provision of the Penal Code under which this indictment has been found, which requires as much as that to be established in the case.

"It is not enough for that prosecution to prove what bribery may have been committed, and that the defendant may have had reason to suspect it, at the time or afterwards, or that he acquiesced in it, or derived any advantage from it, directly or indirectly." Those facts of themselves would not be sufficient to make out this case. It is necessary that he himself should have participated in and been in some measure the means of raising this money with a criminal intent, and then afterwards coming into the hands of these aldermen, or some of them, or some depository to their use, to reward them for this vote of the 30th of August, 1884.

"The prosecution must prove something more than mere suspicion, knowledge, or acquiescence on the part of the defendant or benefit derived. They must prove, beyond all reasonable doubt, that the defendant actively participated in the perpetration of the crime charged in the indictment some time prior to August 30, 1884; that prior to that time he actively participated in the alleged act of giving or offering money to Fullgraff, and in the alleged corrupt intent of giving or offering it to him for the purpose of seducing him from the performance of his duty." That is very much a repetition of the other, and what has been said as to the others is equally applicable to this.

"The only payment, offer, or promise of money for which the defendant

can here be tried is one to or for Fullgraff." That is the case, and so conceded by the prosecution.

"In order to support the charge contained in this indictment, it is necessary for the prosecution to prove that the defendant performed some overt act in relation to bribing Fullgraff." Perhaps this word "overt" is not designed to have any special significance here. What is necessary is, he should be proved to have performed some act intended to contribute or bring about this result.

"In order to justify the inference of legal guilt from circumstantial evidence, the existence of the inculpatory facts must be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt." I have already so said to the jury.

"In order to justify a verdict of guilty against the defendant, the evidence must be such as to exclude every hypothesis but that of his guilt of the offense imputed to him in this indictment; or, in other words, the facts proved must not only all be consistent with and point beyond a reasonable doubt to the defendant's guilt, but they must be inconsistent with his innocence." That is a further repetition, and is undoubtedly true.

"Evidence which leaves it uncertain which of two or more inferences from the facts proved is the true one, or merely establishes a probability, no matter how strong, in favor of one conclusion, does not amount to proof." It must tend to establish the probability of guilt beyond a reasonable doubt, and, if the facts are of such a character as to balance the case beyond a reasonable doubt against the defendant, then it is made out; otherwise it is not.

"Each link in the chain of circumstantial evidence must be established to the same degree of certainty as the main fact itself." That I do not charge, and do not deem it to be the law. What the law designs is that these circumstances should be laid before the jury, and massed together by them, not separately or distinctly, but together, for the purpose of determining in their minds what the circumstance, when they are so massed and considered, sustained by the way of a conclusion. These matters of circumstantial evidence have been described, not inaptly, as twigs, one of which would resist the application of no force whatever, but when you bind them together, one twig after another, until you make a cable or mass of them, they present then a body of strength that can overcome nearly all forms of physical resistance. It is so with circumstances. They are brought into the case, not to be considered separately, and thrown away because each in and of itself does not establish the theory on the part of the prosecution, and they are to be considered at large, one with the other, so far as they are supported and maintained by the evidence; and then the question arises in your mind, what is the effect of all these circumstances that have been proved and combined in this manner? Is it to carry my mind beyond the reach of a reasonable doubt as to the guilt of the defendant? If it is, then it is my duty to convict. If they fail to produce that effect, or if they are consistent with any theory of innocence, then you will give them that construction, and that leads equally to a verdict of not guilty.

"And all the facts taken together must be not only consistent with one another, but must also be inconsistent with the innocence of the accused." That, gentlemen, you recollect, I have just said.

"The inferences of fact to be drawn from circumstances are exclusively for the jury." There is no doubt as to that.

"And if the facts which are claimed by the prosecution to point to the guilt of the defendant are equally consistent with innocence, they do not make out a case against the defendant." It can scarcely be necessary to say anything on that subject, when the law requires that you should carry your convictions beyond a reasonable doubt before a conviction can be secured.

"The reasonable doubt which would make it the duty of the jury to acquit the defendant may rise from the want of credibility of the witnesses upon whose evidence the prosecution must rely to convict." Undoubtedly that is the case, or it may arise from any other source which, in the ordinary course of the exercise of judgment, would suggest its existence.

"The measure of that reasonable doubt of the defendant's guilt which will entitle him to an acquittal is a question addressed to the judgment and conscience of each individual juror, and no juror should agree to a verdict of guilty unless he is convinced of the defendant's guilt beyond a reasonable doubt; and he must be convinced of that, not upon suspicion, not conjecture, not belief, but upon the evidence, and the evidence alone." What that means you will see is this: that each juror must exercise his own judgment. Each juror must consider the weight and effect of the evidence as it bears upon his mind; and, if any juror has a reasonable doubt concerning the existence of the guilt of the defendant, he is required to give the defendant the benefit of that doubt on his own separate and individual judgment, and not on the judgment of any of his associates. What the law requires to convict a person for a crime is that the evidence establishes guilt in the mind of all the jurors beyond a reasonable doubt; and if it fails to do that,—if that is not its weight, strength, and effect,—then the defendant is entitled to the benefit of that doubt.

"The acts and words of Jaehne, De Lacey, Sharp, Foshay, Richmond, and the others are not evidence of a criminal conspiracy against the defendant, and cannot be considered by the jury as such evidence." I have added to that, "unless to carry out a common object after a combination has been otherwise proven." In other words, you cannot use the acts or the statement of one person for the purpose of affecting or establishing the guilt of another unless it is first proved that these persons, either by circumstances or direct proof, are engaged in some joint enterprise or joint object, and are exerting themselves to bring about such a joint result. Where that is the case,—where they are confederated or acting together,—then what one does for the purpose of aiding and promoting the common object is admissible as evidence against the other. Where such is not their relation, the act, conduct, or statement of one has no effect whatever upon the defendant.

"And their acts and sayings cannot be considered as evidence for any purpose whatever, unless the jury finds from the evidence of the defendant's own words and acts, and independently of the words and acts of these other persons, that the defendant was engaged with these other persons in a criminal conspiracy." That is what I have just said to you, gentlemen. Unless there is a combination, and up to the time when the combination is shown to take place, the acts and statements of other persons are not admissible against the defendant. He would be responsible under those circumstances only for his own acts and his own statements. To illustrate: If defendant and Mr. Foshay were engaged in bringing about a common result in this respect they were acting together,—co-operating with each other. What each one did; what each one said, that was explanatory of the act, would be admissible as against the other; but, if there was no combination or no fraternity,—no action,—what Foshay did or said would not be admissible as against the defendant, Mr. Kerr. But the evidence against Mr. Kerr, under those circumstances, would be confined solely and exclusively to what he himself did.

"A conspiracy in law is a combination to commit crime. In order to find that the defendant entered into any conspiracy, the jury must find, from the evidence of the defendant's own words and acts, that he formed one of a combination for the purpose of committing crime, and for the purpose of committing the specific crime of bribing the aldermen, and Fullgraff as one of their number." This proposition, as I understand it, intends to bring out this principle: That you cannot establish a criminal combination between one or

two persons and the third person by what the one or two may say and do themselves. That undoubtedly is the law. You must show that the third person co-operates with them before he can be made responsible or accountable for what they themselves do in his absence.

"The simple fact that parties are engaged together in a common railroad enterprise is in itself no evidence of a conspiracy, nor is it in itself any evidence of any conspiracy that parties are interested in obtaining the consent of the board of aldermen, and worked together for the purpose of obtaining that consent." That undoubtedly is the case. If they were merely engaged in bringing about a railroad result or railroad enterprise, then what they did in that respect would be entirely harmless and innocent, and would have nothing to do with the criminal intent.

"There is no evidence in this case that the defendant had any personal pecuniary interest in the bonds or stock of the Broadway Surface Railroad Company, or in the expected profits of that enterprise." I have added, "except that he subscribed for stock in the company;" and by the articles of association it appears that he subscribed for 100 shares of this stock. What is claimed in this case as his interest tending to lead him into the performance or consummation of a plan, as it has been said in this indictment, was his interest in the Broadway & Seventh-Avenue Railroad, whose president stated, you recollect, at the meeting where he was present, and whose minutes were signed by him, that it was deemed important to unite with other persons to bring about this result, and the reason there assigned, and some evidence appearing from the papers indicating the importance with which that was received and considered by the officers of the company.

*Mr. Bird.* Will your honor state in that connection that there is no evidence of any certificate of stock of the Broadway Surface Railroad Company ever having been issued to him?

*The Court.* There is not. The evidence is the other way. The only evidence is that this one certificate was issued to Mr. Sharp for 9,250 shares, and afterwards went into the hands of the Broadway & Seventh-Avenue Railroad Company.

"Corroboration of Fullgraff will not be sufficient, if it only relates to immaterial and unimportant matters. It must directly tend to the establishment of the distinct fact that there was an agreement to bribe Fullgraff, and that his vote was directly and corruptly given in pursuance of such agreement." That is undoubtedly so.

"Corroboration of Fullgraff must not only tend to the establishment of the fact that there was an agreement by which he was to receive a bribe, and that it was in consequence that he gave his vote, but that he agreed in the manner and under the circumstances detailed by his evidence, and if such evidence does not tend to corroborate such manner and circumstances it is insufficient, and the jury should acquit." I have already said all that is necessary upon this subject,—that you must find that he is corroborated, and so far as he is corroborated, and then determine for yourselves whether he has made a truthful statement here, or whether he still stands in such a situation as to induce you to think that his testimony ought not to be believed.

There are two or three requests which have been handed to me which I will now call your attention to. The first is that the case, as it is made in the indictment, shall be made out by the proof before the defendant can be convicted. I have so stated to you, gentlemen, as plainly as I can if I were to read and repeat the request.

"That the statement alleged to have been made at the meeting at McLoughlin's by Jaehne or De Lacey, to the effect that offers had been made of the sum named by the Broadway Surface Railroad Company, is no evidence against the defendant that such offer, or any offer, had in fact been made by said railroad company, or by any one." I have already said to you that what trans-

pired between these aldermen is no evidence against the defendant, unless you are satisfied that the evidence connected him with these persons to carry out, by his contribution of money, his aid, or assistance, the object that they had in view, and which it is stated to have been the purpose of this meeting to consummate.

"That the alleged statement by De Lacey to Fullgraff, that the money was up, is no evidence against the defendant that the money or any money was in fact up." That, of course, is included in what has been said.

"That there is no evidence in the case that any money or other valuable thing was paid or given to Fullgraff for his vote, or promise to vote, for the application pending before the board, as averred in the indictment, and there can be no conviction of the defendant of bribery for giving or paying such money." That I decline to charge, because the evidence is sufficient to allow that question before you for your consideration.

"That the jury must therefore find, before they can convict, that the defendant offered, or promised to give, money, or some valuable thing, to Fullgraff for his vote on the application alleged in said indictment." I have said that so many times that I fear that I am wearying you.

"If Jacob Sharp was by the agreement bound to construct, equip, and in all respects complete the Broadway Surface Road, and pay all the expenses of perfecting and completing the railroad, with good title thereto, and with all the franchises essential to its enjoyment, one of the incidents of his application would be the obtaining of the consent of the adjacent owners of lands or of the court, and the consent of the common council. Under such a contract he was bound to obtain the consent of the board of aldermen, and if he undertook to do that, and if he did it by unlawful means, his act is not chargeable upon the Seventh-Avenue Road, nor upon the defendant as an officer thereof, unless they actually participated in the criminal act." That undoubtedly is true without the preamble, and I have so said to you several times,—that it is necessary there should be absolute participation on the part of the defendant before he can be convicted. The question is, was there such a participation? Did he actively, as a principal member, raise this amount of money, and, either directly or indirectly, get into the hands of some person before the vote was taken, in August, 1884, by which these men were assured that the money was to be paid to them upon a favorable vote for the resolution, and did he do that designing to fulfil a mere corrupt bargain,—to make himself a party to a corrupt bargain that had been made or taken place between these aldermen? There is another subject I should call your attention to. Upon the part of the defendant he has introduced nine of the ten witnesses who have testified to his good character. That evidence you are to consider in the case precisely the same as you consider the rest of the testimony submitted for your consideration. A man always has the right, in a criminal prosecution, to put in evidence concerning his former good character. It is not, however, conclusive in his favor. It is simply evidence to be considered, with all the other testimony, for the purpose of determining whether the proof, taken as a whole, establishes his guilt beyond a reasonable doubt. If it does not, even this evidence may of itself create a reasonable doubt, and if it does he is entitled to the benefit of that doubt, and entitled to an acquittal in consequence of it. But when you come to take the evidence of character, together with all the other testimony submitted for your consideration, and you are satisfied when you look at it and consider it, and weigh the effect of it upon your own minds and your own judgments, and ultimately your minds are still convinced beyond a reasonable doubt that the defendant is guilty, notwithstanding his previous good character,—notwithstanding his standing and position in the community,—he is guilty in judgment of law, and it is your duty to pronounce him guilty. Of course, gentlemen, it is an unfortunate duty sometimes that juries are required to perform, but the law

places it upon your shoulders, and you are bound to stand by it, and meet it like men of courage and intelligence; and if you are satisfied that the defendant is guilty beyond a reasonable doubt, notwithstanding the fact that he before this time has maintained this excellent character, yet if he has swerved from it, and swerved from the influences and inclinations by which it has been heretofore credited, he is in judgment of law culpable, the same as any other individual would be whose case may be tried before a court and jury for consideration. It is unfortunately true, gentlemen,—too true for the credit of human nature,—that there is that lurking weakness in the human organization that will sometimes, and perhaps on frequent occasions, yield to the inclinations of temptations. Even men of the best standing, men of the most assured life of long and approved integrity and fidelity in all its relations, are found on occasions where these temptations are presented to them to yield, to give way, and fall into the commission of crime. We have been taught to invoke, and it has been invoked by millions, protection against temptation. It is this temptation that results so often in the commission of crime. It subverts human character, it destroys human integrity, it entirely uproots human fidelity, and men under the influence of temptation—under the impulse of the occasion—will give way when it would be expected that they would resist, when it would be expected that they would perform the uniform course of conduct which previously characterized them, and involve themselves in the commission of crime. But these cases are not frequent, though they may undoubtedly be too common. They are too be considered. This weakness of the human character is to be considered in giving its appropriate weight and effect to this evidence of character. It is for you to determine, with that evidence before you, the age, condition of the defendant, and the length of time in which he has been in business, and his position in the community as described by the witnesses, whether you are satisfied, giving the appropriate weight and effect to the probabilities of this class of evidence, still that he is guilty. If you have no reasonable doubt of his guilt in your mind, no matter what his previous character may have been, no matter what his position now is, it is your duty to express that by your verdict. While, on the other hand, if you have a reasonable doubt upon the first or second branch of this case, connecting or creating the defendant's guilt under this indictment, it is equally your duty to give full weight and effect to that doubt, and, if you find that doubt existing in your mind, to acquit him of the charge contained in this indictment.

*Mr. Bird.* I ask your honor to charge there is no case in which the jury may not, in the exercise of a sound discretion, give a prisoner the benefit of a previous good character. No matter how conclusive the testimony may appear to be, the character of the accused may be such as to create a doubt in the minds of the jury, and lead them to believe, in view of the probabilities, that a person of such character would be guilty of the offense charged, that the other evidence in the case is false, or the witness mistaken. An individual accused of crime is entitled to have it left to the jury to form their conclusions, on all the evidence, whether he, if his character were previously unblemished, has or has not committed the particular crime charged against him.

*The Court.* I have said so.

After the conclusion of the charge a colloquy ensued between the court and the counsel for the defense, in which several exceptions were taken, and the court modified, added to, or explained portions of the charge. The court stated that the $200,000 balance in the first monthly report to the commissioners, as testified to by the witness Ramsay, included 178 first mortgage bonds, and that 75 first mortgage bonds were used in placing the 500 second mortgage bonds. As to the statement made by his honor concerning the in-

creasing prevalence of bribery, which fact induced the legislature to provide for it, he directed the jury to dismiss it from their minds, saying that it was entirely incidental. He also stated that, while the jury could not convict on the uncorroborated testimony of the accomplice Fullgraff, they might believe facts stated by him, though uncorroborated, and that, while the law had been changed so as to allow even convicts to testify, the law has not been changed as to the weight to be given to the testimony of accomplices. The court, in answer to an objection based upon his reference to the proceedings before the council, stated that the proceedings and votes of the council tended to support the testimony of Fullgraff, and that the failure of the Fitzpatrick resolution to sell the franchise to the highest bidder tended to establish the state of mind of Fullgraff and the other aldermen prior to the vote taken August 30th. The court stated that the jury might also consider the fact that Fullgraff was promised by the district attorney that he should not be prosecuted for his perjury committed before the senate investigating committee, but that he was only requested to tell the truth.

The jury found the defendant not guilty.